**REDACTED**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | 12-md-02311<br>Honorable Marianne O. Battani |
| In re:  ALTERNATORS<br>In re:  STARTERS | 2:13-cv-00702-MOB-MKM<br>2:13-cv-01102-MOB-MKM |
| THIS RELATES TO:<br><br>ALL AUTOMOBILE DEALER ACTIONS | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br>**[FILED UNDER SEAL-HIGHLY CONFIDENTIAL]** |

**REDACTED**

Plaintiffs Martens Cars of Washington, Inc. ("Plaintiff Martens"); Landers Auto Group No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers"); Hammett Motor Company, Inc. ("Plaintiff Hammett"); Superstore Automotive, Inc. ("Plaintiff Superstore"); Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"); Westfield Dodge City, Inc. ("Plaintiff Westfield"); V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P.");; Green Team of Clay Center Inc. ("Plaintiff Green Team"); McGrath Automotive Group, Inc. ("Plaintiff McGrath "); Table Rock Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"); Archer-Perdue, Inc., d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"); Bonneville and Son, Inc. ("Plaintiff Bonneville"); Pitre, Inc., d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"); Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou");  John Greene Chrysler Dodge Jeep, LLC ("Plaintiff John Greene"); Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet ("Plaintiff Champion"); Charles Daher's Commonwealth Motors, Inc., d/b/a Commonwealth Chevrolet, Commonwealth Kia, Commonwealth Honda ("Plaintiff Commonwealth Motors"); Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth Volkswagen"); Commonwealth Nissan, Inc., d/b/a Commonwealth Nissan ("Plaintiff Commonwealth Nissan"); Ramey Motors, Inc. ("Plaintiff Ramey"); Thornhill Superstore, Inc., d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"); Dave Heather Corporation, d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland"); Central Salt Lake Valley GMC Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"); Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"); Capitol Dealerships, Inc., d/b/a Capitol Toyota ("Plaintiff Capitol Toyota "); Stranger Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade"); John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"); Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley"); Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda"); Lee Auto Malls-Topsham,

REDACTED

Inc. d/b/a Lee Toyota of Topsham ("Plaintiff Topsham"); Cannon Nissan of Jackson, LLC

("Plaintiff Cannon Nissan");; Shearer Automotive Enterprises III, Inc. ("Plaintiff Shearer");

Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan"); Hodges Imported Cars, Inc.

d/b/a Hodges Subaru ("Plaintiff Hodges"); Ancona Enterprise, Inc. d/b/a Frank Ancona Honda

("Plaintiff Ancona"); Bill Pearce Motors d/b/a Bill Pearce Courtesy Honda ("Plaintiff Pearce");

HC Acquisition, LLC d/b/a Toyota of Bristol ("Plaintiff Bristol"); and Apex Motor Corporation

("Plaintiff Apex")

("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as

defined below), upon personal knowledge as to the facts pertaining to themselves and upon

information and belief as to all other matters, and based on the investigation of counsel, bring

this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws

and state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and

allege as follows:

## NATURE OF ACTION

1.     Plaintiffs bring this lawsuit  as a proposed class action against Defendants

DENSO Corporation, DENSO International America, Inc. (together, "DENSO Defendants" or

"DENSO"), Hitachi Automotive Systems, Ltd., Hitachi Automotive Systems Americas, Inc.

(together, "Hitachi Defendants" or "Hitachi"),[1] Mitsuba Corporation, American Mitsuba

Corporation (together, "Mitsuba Defendants" or "Mitsuba"), Mitsubishi Electric Corporation,

Mitsubishi Electric Automotive America, Inc. (together, "Mitsubishi Electric Defendants" or

---

[1] For the purposes of this Complaint, the terms "Hitachi Defendants" or "Defendants" also includes the former Hitachi Automotive Systems Group of Hitachi, Ltd., as it existed prior to July 1, 2009, the former Hitachi Unisia Automotive, Ltd. and the former Tokico, Ltd.

**REDACTED**

"Mitsubishi Electric"), Robert Bosch GmbH, Bosch Electrical Drives Co., Ltd. and Robert Bosch LLC (collectively, "Bosch Defendants" or "Bosch"), (all as defined below, and collectively "Defendants"), and unnamed co-conspirators, manufacturers and/or suppliers of Alternators and Starters (defined below) globally and in the United States, for engaging in a l conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of these products, which were sold to automobile manufacturers in the United States and elsewhere. The Defendants' conspiracy successfully targeted the United States automotive industry, raising prices for car manufacturers, and car and truck dealers.

2. "Alternators" are devices that charge a vehicle's battery and power the electrical system of a vehicle when its engine is running. If the Alternator is not working properly, the battery will eventually lose its charge and all electrical systems in the vehicle will stop working; this includes starting the car.

3. "Starters" or "Starter Motors" are devices that power a vehicle's battery to "turn over" and start when the driver turns the ignition switch. When a Starter is damaged, a vehicle will not turn on.

4. The "Class Period" refers to June 1, 2000, to the present.

5. The Defendants manufacture, market, and sell Alternators and Starters throughout the United States and in other countries.

6. Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to rig bids for, and to fix, stabilize, and maintain the prices of Alternators and Starters. Competition authorities in Japan and possibly elsewhere, have been investigating a

3

REDACTED

conspiracy in the market for Alternators and Starters since at least March 2012. The Japanese

Fair Trade Commission ("JFTC") has raided the offices of Defendants.

7.      On November 22, 2012, the JFTC imposed $41.3 million in fines against various

automotive parts manufacturers, including a $17.2 million against Defendant Mitsubishi Electric

Corporation, for violating antitrust laws by forming a cartel to fix prices for automotive parts

including Alternators and Starters. That same day, the JFTC announced that it would issue

cease-and-desist orders against the violating companies that would require the companies to: (1)

immediately pass resolutions that they would stop any illegal conduct; (2) contact any

automobile maker who might have purchased their parts through collusive bidding processes;

and (3) implement employee compliance programs. According to the JFTC, fellow conspirators

Denso Corp., Hitachi Ltd., and Hitachi Automotive Systems, Ltd. also violated antitrust laws.

8.      Vehicles containing Alternators and Starters, as well as Alternators and Starters

themselves, made by Defendants, are sold in every state of the United States and the District of

Columbia.

9.      The U.S. Department of Justice's ("DOJ") Antitrust Division is currently

conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the

automotive parts industry. As part of its criminal investigation, the DOJ is seeking information

about unlawful anticompetitive conduct in the market for a number of different but related

automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids,

pursuant to search warrants, carried out in the offices of a number of major competitors in the

automotive parts industry. The automotive parts investigation is the largest criminal

investigation the Antitrust Division has ever pursued, both in terms of its scope and and the

potential volume of commerce affected by the alleged illegal conduct.. The ongoing cartel

REDACTED

investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $2.5 billion in criminal fines.

10.     Defendant DENSO Corporation agreed to plead guilty to a two-count criminal Information and to pay a $78 million fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain electronic control units ("ECUs") and heater control panels ("HCPs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 until at least February 2010.  The combination and conspiracy engaged in by Defendant DENSO Corporation and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

11.     In addition to the fact that Defendant DENSO Corporation pleaded guilty and agreed on its own behalf and on behalf of its subsidiaries to cooperating in the government's investigation, several of its high-ranking executives have pleaded guilty to criminal price-fixing in the automotive parts industry.

12.     On March 26, 2012, the DOJ announced that Norihiro Imai, an executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of HCPs sold to customers in the United States and elsewhere.

13.     On April 26, 2012, the DOJ announced that Makoto Hattori, an executive of Defendant DENSO Corporation, agreed to serve fourteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging

REDACTED

in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold to a customer in the United States and elsewhere.

14.     On May 21, 2013, the DOJ announced that Yuji Suzuki, an executive of Defendant DENSO Corporation, agreed to serve sixteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a two-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of ECUs and HCPs sold in the United States and elsewhere.  Also on May 21, 2013, the DOJ announced that Hiroshi Watanabe an executive of Defendant DENSO Corporation, agreed to serve fifteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold in the United States and elsewhere.

15.     On February 20, 2014, the DOJ announced that Kazuaki Fujitani, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison and plead guilty to a one-count criminal Information charging him with obstruction of justice for deleting numerous e-mails and electronic documents upon learning the FBI was executing a search warrant on Defendant DENSO International America, Inc. in connection with the DOJ's investigation into a conspiracy to fix the prices of HCPs installed in automobiles sold in the United States and elsewhere.

16.     On June 30, 2014, the DOJ announced that Satoru Horisaki, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of,

**REDACTED**

automotive instrument panel clusters sold to Honda of America Manufacturing Co. Inc., in the United States and elsewhere.

17.     According to the plea agreements of Defendant DENSO and its former executives, conspiratorial meetings and conversations took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to automobile manufacturers by Defendant DENSO's United States subsidiary, which is located in the Eastern District of Michigan.

18.     Defendant Hitachi Automotive Systems, Ltd. agreed to plead guilty and to pay a $195 million fine for its unlawful conduct in participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, certain automotive products sold to automobile manufacturers, including, Nissan Motor Company, Ltd., Honda Motor Company, Ltd., General Motors Company, Ford Motor Company, Toyota Motor Corporation, Chrysler Group LLC, and Fuji Heavy Industries Ltd., and certain of their subsidiaries, affiliates and suppliers, in the United States and elsewhere, from at least as early as January 2000 until at least February 2010.  For purposes of the plea agreement between Defendant Hitachi Automotive Systems, Ltd. and the United States, "automotive parts" were defined to include, starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters and motor generators.  The combination and conspiracy engaged in by Defendant Hitachi Automotive Systems, Ltd. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

REDACTED

19.     On September 18, 2014, the DOJ announced that a federal grand jury returned a one-count Indictment against Takashi Toyokuni, Ken Funasaki, Kazunobu Tsunekawa and Tomiya Itakura of Hitachi Automotive Systems Ltd. for agreeing to allocate the supply of, rig bids for, and fix, stabilize and maintain the prices of, certain automotive parts sold to various automobile manufacturers such as, Ford Motor Company, General Motors LLC, Nissan Motor Co. Ltd., Toyota Motor Corporation, and Honda Motor Company, Ltd., and others, and certain of their subsidiaries, in the United States and elsewhere.   During the period covered by the Indictment, Takashi Toyokuni, Ken Funasaki, and Kazunobu Tsunekawa worked for Hitachi in the United States and Japan.  For purposes of the Indictment, "automotive parts" included starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters and motor generators.

20.     On April 23, 2015, the DOJ announced that Takashi Toyokuni, a former executive of Defendant Hitachi Automotive Systems Ltd., agreed to serve fifteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Indictment charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of, starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters and motor generators sold, in the United States and elsewhere. From January 2000 to April 2008, Takashi Toyokuni was involved in the sale of and had responsibility over starter motors and alternators.

21.   According to the plea agreements of Defendant Hitachi Automotive Systems Ltd. and its former executive, conspiratorial meetings and discussions took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to Nissan, Honda, GM, Ford, Toyota, and others, and certain of their subsidiaries,

REDACTED

affiliates and suppliers in the U.S. and elsewhere, by Hitachi Automotive Systems Americas, Inc., which is located in the Eastern District of Michigan.

22.     Defendant Mitsuba Corporation agreed to plead guilty and to pay a criminal fine of $135 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts sold to automobile manufacturers, including Honda Motor Company, Ltd., Fuji Heavy Industries Ltd., Nissan Motor Company, Ltd., Toyota Motor Corporation, Chrysler Group LLC, and certain of their subsidiaries, affiliates and suppliers in the United States and elsewhere, from at least as early as January 2000 through at least February 2010.  "Automotive parts," for purposes of the plea agreement, included, among other parts, starter motors.  The combination and conspiracy engaged in by Defendant Mitsuba Corporation and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

23.     On December 1, 2014, the DOJ announced that a former executive of Defendant Mitsuba, Kazumi Umahashi, agreed to serve thirteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count Information charging him with conspiring to fix the prices of certain automotive parts installed in cars sold in the United States and elsewhere. According to the Information, Kazumi Umahashi participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts, including windshield wiper systems and starter motors sold to Honda Motor Company Ltd. and certain of its subsidiaries, affiliates, suppliers, and others in the United States and elsewhere.

REDACTED

24.     According to the plea agreements of Defendant Mitsuba and its former executive, conspiratorial meetings and discussions took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to Honda, Nissan, Toyota, Chrysler and others, and certain of their subsidiaries, affiliates and suppliers located in the U.S. and elsewhere, by Defendant Mitsuba and its U.S. subsidiaries located in the Eastern District of Michigan and elsewhere.

25.     Defendant Mitsubishi Electric Corporation agreed to plead guilty and to pay a criminal fine of $190 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the price of, certain automotive parts sold to automobile manufacturers, including Ford Motor Company, General Motors LLC, Chrysler Group LLC, Fuji Heavy Industries Ltd., Nissan Motor Company, Ltd., Honda Motor Company, Ltd., Toyota Motor Corporation, and certain of their subsidiaries, in the United States and elsewhere, from at least as early as January 2000 until at least February 2010.  "Automotive parts," for purposes of the plea agreement, included, among other products, starter motors, alternators, and ignition coils.  The combination and conspiracy engaged in by Defendant Mitsubishi Electric Corporation and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

26.     On September 18, 2014, the DOJ announced that a federal grand jury returned a three-count Indictment against Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito, current and former executives of Mitsubishi Electric Corporation, for their participation in a conspiracy to fix the prices of certain automotive parts, including starter motors, alternators, and ignition coils. Count one charged Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito with participating in a

REDACTED

conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, various automotive parts sold to Ford Motor Company., General Motors LLC, Chrysler Group LLC, Fuji Heavy Industries Ltd., Nissan Motor Company Ltd., Honda Motor Company Ltd., and certain of their subsidiaries, in the United States and elsewhere.  Count two charged Minoru Kurisaki and Hideyuki Saito with knowingly conspiring to obstruct justice by destroying documents and corruptly persuading, and attempting to persuade others, to destroy documents related to an official proceeding, grand jury investigation, and U.S. agency investigation.  Count three charged Hideyuki Saito with knowingly and corruptly persuading, or attempting to persuade, other employees of Mitsubishi Electric Corporation to destroy or conceal paper documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere with the intent to impair the objects' availability and integrity for use in an official proceeding.

27.     According to Defendant Mitsubishi's plea agreement, conspiratorial meetings and discussions took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to Ford, GM, Chrysler, Subaru, Honda, Nissan, and others, and certain of their subsidiaries, by Defendant Mitsubishi's U.S. indirect subsidiary Mitsubishi Electric Automotive America, Inc., which is located in the Eastern District of Michigan.

28.     Defendant Robert Bosch GmbH agreed to plead guilty and to pay a criminal fine of $57.8 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the price of, automotive parts sold to automobile manufacturers, including DaimlerChrysler AG, Ford Motor Company, General Motors Company, Andreas Stihl AG & Co. and others, and certain of their subsidiaries, in the United States and elsewhere, from at least as

**REDACTED**

early as January 2000 until at least July 2011.  For purposes of the plea agreement, the term "Automotive parts" included, starter motors, spark plugs, and oxygen sensors.  The combination and conspiracy engaged in by Defendant Bosch and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

29.     The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, Alternators and Starters sold to vehicle manufacturers and others in the United States.  The combination and conspiracy engaged in by the Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection and unjust enrichment laws.

30.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for Alternators and Starters. Plaintiffs and the members of the Classes have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

31.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).   Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violations

REDACTED

of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

32.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants.

33.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

34.     This Court has *in personam* jurisdiction over the Defendants because each Defendant, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Alternators and Starters throughout the United States, including in this District, that were specifically designed for vehicles that were intended to be sold in the United States; (c) had substantial aggregate contacts with the United States, including in this District, as a whole; or (d) was through its own actions and through the actions of its co-conspirators, engaged in an illegal price-fixing conspiracy that was directed at,

**REDACTED**

and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District; and/or (e) engaged in actions in furtherance of an illegal conspiracy in this district either itself or through its co-conspirators.  The Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

35.    The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States and upon import trade and commerce into the United States.

36.    The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. In addition, Defendants DENSO, Hitachi, Mitsuba, Mitsubishi Electric, and Bosch each participated in conspiratorial meetings and discussions located in the United States; each participated in price manipulation and market allocation for automotive parts installed in vehicles manufactured and sold solely in the United States; each coordinated their price fixing schemes and conspiratorial agreements with subsidiaries located in the United States; and each took further actions in furtherance of the conspiracy with employees and co-conspirators located in the United States.

37.    Alternators and Starters manufactured abroad by the Defendants and sold for use in automobiles in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Alternators and Starters are purchased in the United States, and such Alternators and Starters do not constitute import commerce, the

REDACTED

Defendants' activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and the Classes in the United States.

38.     By reason of the unlawful activities hereinafter alleged, the Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  The Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Alternators and Starters, which conspiracy unreasonably restrained trade and adversely affected the market for Alternators and Starters.

39.     The Defendants' conspiracy and wrongdoing described herein adversely affected persons and businesses in the United States who purchased or leased Alternators and Starters, including Plaintiffs and the Classes. .

## PARTIES

### Plaintiffs

40.     Plaintiff Martens is a Maryland corporation that had its principal place of business in the District of Columbia during the Class Period.  During the Class Period Plaintiff Martens was an authorized Volvo and Volkswagen dealer who sold Volvo- and Volkswagen-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.

41.     During the Class Period, Plaintiff Martens purchased vehicles containing Alternators and Starters manufactured by one or more of the Defendants or co-conspirators.

REDACTED

Plaintiff Martens also purchased Alternators and Starters, manufactured by one or more of the Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Martens purchased and received both these vehicles and Alternators and Starters in the District of Columbia. Plaintiff Martens has also displayed, sold, and advertised its vehicles in the District of Columbia during the Class Period.

42. Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas. Plaintiff Landers is an authorized Toyota dealer who bought Toyota-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

43. During the Class Period, Plaintiff Landers purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Landers also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Landers purchased and received both the afore-mentioned vehicles and Alternators and Starters in Arkansas. Plaintiff Landers has also displayed, sold, serviced, and advertised its vehicles in Arkansas during the Class Period.

44. Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi. Plaintiff Hammett is an authorized Ford dealer who bought Ford-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

REDACTED

45.     During the Class Period, Plaintiff Hammett purchased vehicles containing Alternators and Starters manufactured by Defendants or their co-conspirators.  Plaintiff Hammett also purchased Alternators and Starters, manufactured by Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hammett purchased and received both the afore-mentioned vehicles and Alternators and Starters in Mississippi.  Plaintiff Hammett has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

46.     Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota.  Plaintiff Superstore is an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore.  Plaintiff Superstore bought Buick- and GMC-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

47.     During the Class Period, Plaintiff Superstore purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Superstore also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Superstore purchased and received both the afore-mentioned vehicles and Alternators and Starters in Minnesota.  Plaintiff Superstore has also displayed, sold, serviced, and advertised its vehicles in Minnesota during the Class Period.

48.     Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida.  Plaintiff Lee is presently an authorized GMC dealer.  During the Class

REDACTED

Period, Plaintiff Lee was also an authorized Pontiac, Oldsmobile and Jeep dealer.  Plaintiff Lee buys GMC-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.  During the Class Period, Plaintiff Lee bought Pontiac-, Oldsmobile-, and Jeep-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.

49.     During the Class Period, Plaintiff Lee purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lee purchased and received both the afore-mentioned vehicles and Alternators and Starters in Florida.  Plaintiff Lee has also displayed, sold, serviced, and advertised its vehicles in Florida during the Class Period.

50.     Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York.  Plaintiff Westfield is an authorized Chrysler dealer, who bought Chrysler-, Dodge-, and Jeep-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

51.     During the Class Period, Plaintiff Westfield purchased vehicles containing Alternators and Starters manufactured one or more Defendants or their co-conspirators.  Plaintiff Westfield also purchased Alternators and Starters, manufactured by one or more

18

REDACTED

Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Westfield purchased and received both the afore-mentioned vehicles and Alternators and Starters in New York.  Plaintiff Westfield has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

52.     Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California.  Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who bought Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

53.     During the Class Period, Plaintiff V.I.P. purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff V.I.P. also purchased Alternators and Starters, for its repair and service business, during the Class Period.  Plaintiff V.I.P. purchased and received both the afore-mentioned vehicles and Alternators and Starters in California.  Plaintiff V.I.P. has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

54.     Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas.  Plaintiff Green Team is an authorized Chrysler, Jeep, Dodge, and Ram dealer, who bought Chrysler-, Jeep-, Dodge-, and Ram-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

REDACTED

55.      During the Class Period, Plaintiff Green Team purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Green Team also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Green Team purchased and received both the afore-mentioned vehicles and Alternators and Starters in Kansas.  Plaintiff Green Team has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

56.      Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa.  Plaintiff McGrath is an authorized Buick, GMC, Chevrolet, Chrysler, Dodge, Jeep, Ram, Kia, and Cadillac dealer, who bought Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia-, and Cadillac-brand cars containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters  manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

57.      During the Class Period, Plaintiff McGrath purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff McGrath also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff McGrath purchased and received both the afore-mentioned vehicles and Alternators and Starters in Iowa.  Plaintiff McGrath has also displayed, sold, serviced, and advertised its vehicles in Iowa during the Class Period.

58.      Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska.  Plaintiff Table Rock is an authorized Hyundai dealer, who

**REDACTED**

bought Hyundai-brand cars containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

59.     During the Class Period, Plaintiff Table Rock purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Table Rock also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Table Rock purchased and received both the afore-mentioned vehicles and Alternators and Starters in Nebraska.  Plaintiff Table Rock has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

60.     Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska.  Plaintiff Archer-Perdue is an authorized Suzuki dealer, who, during the Class Period, has bought Suzuki-brand cars containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.

61.     During the Class Period, Plaintiff Archer-Perdue purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Archer-Perdue also purchased Alternators and Starters , manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Archer-Perdue purchased and received both the afore-mentioned vehicles and Alternators and Starters in Nebraska.  Plaintiff Archer-Perdue has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

**REDACTED**

62.     Plaintiff Bonneville is a New Hampshire corporation, with its principal place of business in Manchester, New Hampshire.  Plaintiff Bonneville is an authorized Dodge, Chrysler, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

63.     During the Class Period, Plaintiff Bonneville purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Bonneville also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Bonneville purchased and received both the afore-mentioned vehicles and Alternators and Starters in New Hampshire.  Plaintiff Bonneville has also displayed, sold, serviced, and advertised its vehicles in New Hampshire during the Class Period.

64.     Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico.  Plaintiff Pitre is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

65.     During the Class Period, Plaintiff Pitre purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Pitre also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.

REDACTED

Plaintiff Pitre purchased and received both the afore-mentioned vehicles and Alternators and Starters in New Mexico.  Plaintiff Pitre has also displayed, sold, serviced, and advertised its vehicles in New Mexico during the Class Period.

66.     Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan.  Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

67.     During the Class Period, Plaintiff Patsy Lou purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Patsy Lou also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Patsy Lou purchased and received both the afore-mentioned vehicles and Alternators and Starters in Michigan.  Plaintiff Patsy Lou has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

68.     Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene is an authorized Chrysler, Dodge, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

69.     During the Class Period, Plaintiff John Greene purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators.

**REDACTED**

Plaintiff John Greene also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff John Greene purchased and received both the afore-mentioned vehicles and Alternators and Starters in North Carolina.  Plaintiff John Greene has also displayed, sold, serviced, and advertised its vehicles in North Carolina during the Class Period.

70.     Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.  Plaintiff Champion is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

71.     During the Class Period, Plaintiff Champion purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Champion also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Champion purchased and received both the afore-mentioned vehicles and Alternators and Starters in Nevada.  Plaintiff Champion has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

72.     Plaintiff Commonwealth Motors is a Delaware corporation, with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Motors is an authorized Chevrolet, Honda, and Kia dealer, who bought Chevrolet-, Honda-, and Kia-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

**REDACTED**

73.     During the Class Period, Plaintiff Commonwealth Motors purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Motors also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Motors purchased and received both the afore-mentioned vehicles and Alternators and Starters in Massachusetts.  Plaintiff Commonwealth Motors has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

74.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who bought Volkswagen-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

75.     During the Class Period, Plaintiff Commonwealth Volkswagen purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Volkswagen also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Volkswagen purchased and received both the afore-mentioned vehicles and Alternators and Starters in Massachusetts.  Plaintiff Commonwealth Volkswagen has also displayed, sold, serviced and advertised its vehicles in Massachusetts during the Class Period.

REDACTED

76.     Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in the Lawrence, Massachusetts.  Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

77.     During the Class Period, Plaintiff Commonwealth Nissan purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Nissan also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Nissan purchased and received both the afore-mentioned vehicles and Alternators and Starters in Massachusetts.  Plaintiff Commonwealth Nissan has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

78.     Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia.  Plaintiff Ramey is an authorized Toyota, Chrysler, Dodge, Jeep, and Ram dealer, who bought Toyota-, Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

79.     During the Class Period, Plaintiff Ramey purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators.  Plaintiff Ramey also purchased Alternators and Starters, manufactured by one or more

26

**REDACTED**

Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Ramey purchased and received both the afore-mentioned vehicles and Alternators and Starters in West Virginia. Plaintiff Ramey has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

80.     Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia. Plaintiff Thornhill is an authorized Chevrolet, Buick, and GMC dealer, who bought Chevrolet-, Buick-, and GMC-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

81.     During the Class Period, Plaintiff Thornhill purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Thornhill also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Thornhill purchased and received both the afore-mentioned vehicles and Alternators and Starters in West Virginia. Plaintiff Thornhill has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

82.     Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin. Plaintiff Lakeland is an authorized Toyota, Honda, Mazda, and Subaru dealer who bought Toyota- Honda-, Mazda-, and Subaru-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

27

**REDACTED**

83.     During the Class Period, Plaintiff Lakeland purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Lakeland also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Lakeland purchased and received both the afore-mentioned vehicles and Alternators and Starters in Wisconsin.  Plaintiff Lakeland has also displayed, sold, serviced, and advertised its vehicles in Wisconsin during the Class Period.

84.     Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah.  Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

85.     During the Class Period, Plaintiff Salt Lake Valley purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators.  Plaintiff Salt Lake Valley also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Salt Lake Valley purchased and received both the afore-mentioned vehicles and Alternators and Starters in Utah.  Plaintiff Salt Lake Valley has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

86.     Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon.  Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Chevrolet-, Cadillac-, and Subaru-brand vehicles containing

**REDACTED**

Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

87.     During the Class Period, Plaintiff Capitol Chevrolet purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators.  Plaintiff Capitol Chevrolet also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Capitol Chevrolet purchased and received both the afore-mentioned vehicles and Alternators and Starters in Oregon.  Plaintiff Capitol Chevrolet has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

88.     Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon.  Plaintiff Capitol Toyota is an authorized Toyota dealer, who bought Toyota-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

89.     During the Class Period, Plaintiff Capitol Toyota purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Capitol Toyota also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Capitol Toyota purchased and received both the afore-mentioned vehicles and Alternators and Starters in Oregon.  Plaintiff Capitol Toyota has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

REDACTED

90.     Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah.  Plaintiff Wade is an authorized Toyota dealer, who bought Toyota-brand cars containing Alternators and Starters manufactured by the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by the Defendants or their co-conspirators during the Class Period.

91.     During the Class Period, Plaintiff Wade purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Wade also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Wade purchased and received both the afore-mentioned vehicles and Alternators and Starters in Utah.  Plaintiff Wade has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

92.     Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer, who bought Toyota-brand cars containing Alternators and Starters manufactured by the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by the Defendants or their co-conspirators during the Class Period.

93.     During the Class Period, Plaintiff Johnson purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Johnson also purchased Alternators and Starters manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Johnson purchased and received both the afore-mentioned vehicles and Alternators

REDACTED

and Starters in Mississippi.  Plaintiff Johnson has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

94.     Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York.  During the Class Period, Plaintiff Hartley has been an authorized Honda, Buick, Pontiac, and GM dealer, who bought Honda-, Buick-, Pontiac-, and GM-brand cars containing Alternators and Starters manufactured by the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by the Defendants or their co-conspirators.

95.     During the Class Period, Plaintiff Hartley purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators.  Plaintiff Hartley also purchased Alternators and Starters manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hartley purchased and received both the afore-mentioned vehicles and Alternators and Starters in New York.  Plaintiff Hartley has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

96.     Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine.  Plaintiff Lee Honda is an authorized Honda dealer, who bought Honda-brand cars containing Alternators and Starters manufactured by the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by the Defendants or their co-conspirators during the Class Period.

97.     During the Class Period, Plaintiff Lee Honda purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee Honda also purchased Alternators and Starters manufactured by one or more

31

REDACTED

Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Lee Honda purchased and received both the afore-mentioned vehicles and Alternators and Starters in Maine. Plaintiff Lee Honda has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

98.     Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine. Plaintiff Topsham is an authorized Toyota dealer, who bought Toyota-brand cars containing Alternators and Starters manufactured by the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by the Defendants or their co-conspirators during the Class Period.

99.     During the Class Period, Plaintiff Topsham purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Topsham also purchased Alternators and Starters manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Topsham purchased and received both the afore-mentioned vehicles and Alternators and Starters in Maine. Plaintiff Topsham has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

100.    Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi. Plaintiff Cannon is an authorized Nissan dealer, who bought Nissan-brand cars containing Alternators and Starters manufactured by the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by the Defendants or their co-conspirators during the Class Period.

101.    During the Class Period, Plaintiff Cannon Nissan purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators.

REDACTED

Plaintiff Cannon Nissan also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Cannon purchased and received both the afore-mentioned vehicles and Alternators and Starters in Mississippi.  Plaintiff Cannon has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

102.    Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont.  Plaintiff Shearer is an authorized Honda dealer, who bought Honda-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

103.    During the Class Period, Plaintiff Shearer purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Shearer also purchased Alternators and Starters manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Shearer purchased and received both the afore-mentioned vehicles and Alternators and Starters in Vermont.  Plaintiff Shearer has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

104.    Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California.  Plaintiff Empire Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as wells as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

REDACTED

105.     During the Class Period, Plaintiff Empire Nissan purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Empire Nissan also purchased Alternators and Starters manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period. Plaintiff Empire Nissan purchased and received both the afore-mentioned vehicles and Alternators and Starters in California.  Plaintiff Empire Nissan has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

106.     Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer, who bought Subaru-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

107.     During the Class Period, Plaintiff Hodges purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Hodges also purchased Alternators and Starters manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period. Plaintiff Hodges purchased and received both the afore-mentioned vehicles and Alternators and Starters in Michigan.  Plaintiff Hodges has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

108.     Plaintiff Ancona is a Missouri corporation, with its principal place of business in Oalthe, Kansas during the Class Period.  Plaintiff Ancona was an authorized Honda dealer during the Class Period, who, during the Class Period, bought Honda-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-

**REDACTED**

conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.

109.    During the Class Period, Plaintiff Ancona purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Ancona also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Ancona purchased and received both the afore-mentioned vehicles and Alternators and Starters in Kansas.  Plaintiff Ancona has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

110.    Plaintiff Pearce is a Nevada corporation, with its principal place of business in Reno, Nevada during the Class Period.  Plaintiff Pearce was an authorized Honda dealer during the Class Period, who, during the Class Period, bought Honda-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators.

111.    During the Class Period, Plaintiff Pearce purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Pearce also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Pearce purchased and received both the afore-mentioned vehicles and Alternators and Starters in Nevada.  Plaintiff Pearce has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

REDACTED

112. Plaintiff Bristol is a Tennessee limited liability company with its principal place of business in Bristol, Tennessee. Plaintiff Bristol is an authorized Toyota dealer during the Class Period, who purchased Toyota- brand cars containing Alternators and Starters manufactured by the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by the Defendants or their co-conspirators.

113. During the Class Period, Plaintiff Bristol purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Bristol also purchased Alternators and Starters manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Bristol purchased and received both the afore-mentioned vehicles and Alternators and Starters in Tennessee. Plaintiff Bristol has also displayed, sold, serviced, and advertised its vehicles in Tennessee during the Class Period.

114. Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont. Plaintiff Apex is an authorized Acura dealer, who bought Acura-brand vehicles containing Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators, as well as Alternators and Starters manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

115. During the Class Period, Plaintiff Apex purchased vehicles containing Alternators and Starters manufactured by one or more Defendants or their co-conspirators. Plaintiff Apex also purchased Alternators and Starters, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Apex purchased and received both the afore-mentioned vehicles and Alternators and

REDACTED

Starters in Vermont.  Plaintiff Apex has also displayed, sold, serviced and advertised its

vehicles in Vermont during the Class Period.

## Defendants

## DENSO Defendants

116.    Defendant DENSO Corporation is a Japanese corporation with its principal place

of business in Kariya, Japan.   Defendant DENSO Corporation – directly and/or through its

subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold

Alternators and Starters that were sold and purchased throughout the United States, including in

this district, during the Class Period. Denso accounts for 20 percent of the market for Alternators

worldwide.

117.    Defendant DENSO International America, Inc. is a Delaware corporation with its

principal place of business in Southfield, Michigan.   It is a subsidiary of and wholly owned

and/or controlled by its parent, DENSO Corporation.   Defendant DENSO International America,

Inc. manufactured, marketed and/or sold Alternators and Starters that were sold and purchased

throughout the United States, including in this district, during the Class Period. At all times

during the Class Period, its activities in the United States were under the control and direction of

its Japanese parent.

## Hitachi Defendants

118.    Defendant Hitachi Automotive Systems, Ltd. is a Japanese corporation with its

principal place of business in Tokyo, Japan.  Hitachi Automotive Systems, Ltd. – directly and/or

through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed

and/or sold Alternators and Starters that were sold and purchased throughout the United States,

including in this District, during the Class Period.

REDACTED

119.    Defendant Hitachi Automotive Systems Americas, Inc. is a Delaware corporation with its principal place of business in Harrodsburg, Kentucky.  It is a subsidiary of and wholly owned and/or controlled by its parent, Hitachi Automotive Systems, Ltd.  Hitachi Automotive Systems Americas, Inc. manufactured, marketed and/or sold Alternators and Starters that were sold and purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

**Mitsubishi Defendants**

120.    Defendant Mitsubishi Electric Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Mitsubishi Electric Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Alternators and Starters that were sold and purchased throughout the United States, including in this District, during the Class Period.

121.    Defendant Mitsubishi Electric US Holdings, Inc. is a Delaware corporation with its principal place of business in Cypress, California.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Electric Corporation. Defendant Mitsubishi Electric US Holdings, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Alternators and Starters that were sold and purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

122.    Defendant Mitsubishi Electric Automotive America, Inc. is a Delaware corporation with its principal place of business in Mason, Ohio.  It is a subsidiary of and wholly

REDACTED

owned and/or controlled by its parent, Mitsubishi Electric US Holdings.  Defendant Mitsubishi Electric Automotive America, Inc. manufactured, marketed and/or sold Alternators and Starters that were sold and purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its United States or Japanese parents.

**Mitsuba Defendants**

123.    Defendant Mitsuba Corporation is a Japanese company with its principal place of business in Gunma, Japan.  Mitsuba Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Alternators and Starters that were sold and purchased throughout the United States, including in this District, during the Class Period.

124.    Defendant American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsuba Corporation. American Mitsuba Corporation manufactured, marketed and/or sold Alternators and Starters that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

**Bosch Defendants**

125.    Defendant Robert Bosch GmbH is a German company with its headquarters in Stuttgart, Germany.  Robert Bosch GmbH – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Alternators and Starters

REDACTED

that were sold and purchased throughout the United States, including in this District, during the Class Period.

126.     Defendant Robert Bosch LLC is a Delaware company with its principal place of business in Farmington Hills, Michigan. It is an affiliate of and wholly controlled by Bosch Electrical Drives Co., Ltd.  Robert Bosch LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Alternators and Starters that were sold and purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Korean parent.

## AGENTS AND CO-CONSPIRATORS

127.     When Plaintiffs refer to a corporate family or companies by a single name in the Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family.  The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

128.     Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

129.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses

**REDACTED**

alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

130.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.  The Alternators and Starters Industry

131.     "Alternators" are devices that charge a vehicle's battery and powers the electrical system of a vehicle when its engine is running. If the alternator is not working properly, the battery will eventually lose its charge and all electrical systems in the vehicle will stop working; this includes starting the car.  See Figure 1.



Figure 1.

132.     "Starters" and "Starter Motors" are devices that power a vehicle's battery to "turn over" and start when the driver turns the ignition switch. When a Starter is damaged, a vehicle will not turn on. See Figure 2.

**REDACTED**



Figure 2.

133.    Alternators and Starters are part of the vehicle's starting and charging system. The starting system includes the batter, starter, solenoid, ignition switch, and in some cases, a starter relay.   A typical charging system contains an alternator, drive belt, battery, voltage regulator and the associated wiring.   The charging system, like the starting system is a series circuit with the battery wired in parallel.   After the engine is started and running, the alternator takes over as the source of power and the battery becomes part of the load on the charging system. See Figure 3.



Figure 3.

**REDACTED**

134.    In 2011, the U.S. OEM market for Alternators and Starters was $243 million. From January 2000 to April 2008, Hitachi Automotive's sales of Starters to GM and Nissan; together with sales of Alternators to Nissan in the United States and elsewhere totaled more than $100 million.

135.    The main manufacturers of starter motors and alternators include Bosch, Denso, Mitsuba, Mitsubishi Electric, Remy International and Valeo.  Denso and Valeo ranked as the largest manufacturers of original equipment alternators for passenger cars and light truck applications in the world in 2013, followed by Bosch, Mitsubishi Electric, and Remy International.

136.    Alternators and Starters are installed by original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.

137.    For new cars, the OEMs – mostly large automotive manufacturers such as Ford Motor Company, Toyota Motor Corporation, General Motors, etc. – purchase Alternators and Starters directly from Defendants.

138.    When purchasing Alternators and Starters, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model-specific parts. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years.  Typically, the bidding process begins approximately three years prior to the start of production of a new model.  OEMs procure Alternators and Starters and other parts for U.S.-manufactured vehicles in the United States and elsewhere.

REDACTED

139.    For Alternators and Starters, OEMs will often request price quotations for both parts within the same RFQ. As a result, automotive parts suppliers typically use the same sales team for Alternators and Starters when working with the OEMs.

140.    Defendants and their co-conspirators supplied Alternators and Starters to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Alternators and Starters (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan and elsewhere for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan and elsewhere for installation in vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

141.    Plaintiffs and members of the proposed Classes purchased Alternators and Starters indirectly from one or more of the Defendants and their co-conspirators.  By way of example, automobile dealers indirectly purchased Alternators and Starters from Defendants when they purchase new vehicles ot sell or lease to consumers.

**B.  <u>The Structure and Characteristics of the Alternators and Starters Market Render the Conspiracy More Plausible</u>**

142.    The structure and other characteristics of the Alternators and Starters market in the United States is conducive to a price-fixing agreement and has made collusion particularly attractive in this market.  Specifically, the Alternators and Starters market: (1) has high barriers to entry; (2) has inelasticity of demand; and, (3) has high market concentration.

### 1.    *The Alternators and Starters Market Has High Barriers to Entry*

143.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are

**REDACTED**

less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

144. There are substantial barriers that preclude, reduce, or make more difficult entry into the Alternators and Starters market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

145. The Defendants own several patents related to the manufacture of Alternators and Starters. For example, the Hitachi Defendants own at least two patents related to the manufacture of alternators for motor vehicles, and own at least two patents related to the manufacture of starters used in motor vehicles. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

146. Within Alternators and Starters, there is a significant amount of technology and engineering expertise required to build systems that fully comply with environmental and public health requirements and other regulatory standards including fuel economy requirements.

147. In addition, OEMs cannot randomly change Alternators and Starters suppliers after they choose one because the OEMs design the features of their vehicles so that the Alternators and Starters it purchases for a vehicle are then integrated with the other components of the starting and charging systems of the particular vehicle model. Thus, Alternators and Starters manufacturers and OEMs must agree on a design that is unique to a particular vehicle model. It would be difficult for a new market entrant to do so.

REDACTED

### 2. There is Inelasticity of Demand for Alternators and Starters

148. "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

149. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

150. Demand for Alternators and Starters is highly inelastic. Demand for Alternators and Starters is inelastic because there are no close substitutes for these products. In addition, customers must purchase Alternators and Starters as an essential part of a vehicle, even if the prices are kept at a supra-competitive level. Anyone wanting to purchase a car simply has no choice but to purchase Alternators and Starters.

### 3. Market Concentration

151. A highly concentrated market is more susceptible to collusion and other anticompetitive practices. Only a handful of manufacturers supply Alternators for installation in vehicles sold in the U.S. and the market is concentrated. According to a leading industry report, the top four suppliers of Alternators controlled approximately 70 percent of the global market in 2010.

**REDACTED**

152.    There is also a high level of concentration among firms in the Starters market. According to a leading industry report, the top four suppliers of Starters controlled approximately 76 percent of the global market in 2010.

### C.  <u>Government Investigations</u>

153.    A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada and Japan, aimed at suppliers of automotive parts in general, and Alternators and Starters in particular.  A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that the international automotive parts investigation would continue to widen because the automotive industry as a whole comprises many sub-industries.  He characterized the investigation being conducted by the international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

154.    The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC").  The EC and the FBI have executed surprise raids at the European and U.S. offices of several auto parts manufacturers, including certain Defendants, as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

155.    On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers.  The DOJ has confirmed that its automotive parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct.  The DOJ has levied more than $2.5 billion in criminal fines against various automotive parts manufacturers.

**REDACTED**

156.     In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of DENSO Corporation as part of an expansive investigation into collusion in the automotive parts industry dating back to at least 2000.

157.     The JFTC raided offices of Defendants as part of the spreading investigation into suspected price fixing on automotive parts.  According to its 2011 Annual Report, DENSO Corporation was investigated on July 20, 2011 at various locations, including in Kariya, Aichi and some other sales branches in Japan.  And according to its 2011 Annual Report, Mitsubishi Electric Corporation has been subject to investigations conducted by the JFTC since July 2011.

158.     The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

159.     Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation. The FBI executed warrants and searched the offices of these companies, including DENSO Corporation's subsidiary in Southfield, Michigan. Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

160.     To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed

REDACTED

evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

**Defendant DENSO Corporation Pleads Guilty to Price-Fixing ECUs and HCPs**

161.   On January 30, 2012, the DOJ announced that Defendant DENSO Corporation had agreed to pay a $78 million fine and plead guilty to a two-count Information charging it with: (1) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, electronic control units ("ECUs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and until at least February 2010 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (2) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, heater control panels ("HCPs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

162.   According to the criminal Information filed against it, Defendant DENSO Corporation and its co-conspirators carried out the ECU and HCP conspiracy by:

      (a)     participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

**REDACTED**

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of ECUs and HCPs sold to an automobile manufacturer in the United States and elsewhere on a model-by-model basis;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by an automobile manufacturer in the United States and elsewhere;

(e)     submitting bids, price quotations, and price adjustments to an automobile manufacturer in the United States and elsewhere in accordance with the agreements reached;

(f)     selling ECUs and HCPs to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for ECUs and HCPs sold to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices;

(h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)     employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

REDACTED

## Defendant Hitachi Automotive Systems, Ltd. Pleads Guilty to Price-Fixing Certain Automotive Parts

163.    On September 26, 2013, the DOJ announced that Defendant Hitachi Automotive Systems, Ltd. agreed to pay a $195 million criminal fine and to plead guilty to a one-count criminal Information charging it with participating in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts sold to Nissan Motor Company, Ltd., Honda Motor Company, Ltd., General Motors LLC, Ford Motor Company, Toyota Motor Corporation, Chrysler Group, LLC, Fuji Heavy Industries, Ltd., and certain of their subsidiaries and certain of its subsidiaries in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1. For purposes of Hitachi's plea agreement, "automotive parts" is defined to include, among other automotive parts, starter motors and alternators.

164.    According to the Information filed, Defendant Hitachi Automotive Systems, Ltd. and its co-conspirators carried out the Alternators and Starters conspiracy by:

> (a)    participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

> (b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

> (c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of automotive parts sold to automobile manufactures in the United States and elsewhere;

**REDACTED**

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)     submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for automotive parts sold to automobile manufacturers in the United State and elsewhere at collusive and noncompetitive prices;

(h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)     employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

**Defendant Mitsuba Corporation Pleads Guilty to Price-Fixing Certain Automotive Parts**

165.    On September 26, 2013, the DOJ announced that Defendant Mitsuba Corporation agreed to pay a $135 million criminal fine and plead guilty to a two-count Information charging it with: (i) participating in a combination and conspiracy to suppress and eliminate competition in automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts sold to automobile manufacturers, including Honda Motor Company Ltd., Fuji Heavy Industries Ltd., Nissan Motor Company Ltd., Toyota Motor Corporation, Chrysler Group, LLC, and certain of their subsidiaries in the United States and

**REDACTED**

elsewhere, from at least as early as January 2000 through at least February 2010, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (ii) altering, destroying, mutilating, concealing, covering up, falsifying and making false entries in documents and tangible objects with the intent to impede, obstruct, and influence the investigation of the conduct charged in the other count, and in relation to and contemplation of such investigation, in violation of 18 U.S.C. § 1519.  For purposes of Mitsuba's plea agreement, "automotive parts" are defined to include, among other automotive parts, starter motors.

166.    According to the Information filed, Defendant Mitsuba Corporation and its co-conspirators carried out the automotive parts combination and conspiracy by, among other things, the following:

(a)    participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

(d)    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

**REDACTED**

    (e)     submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

    (f)     selling certain automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

    (g)     accepting payment for certain automotive parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

    (h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme;

    (i)     employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

167.    With respect to the obstruction of justice count, the Mitsuba Information charged as follows:

> In or about February 2010, Executive A, acting on Defendant's behalf, knowingly altered, destroyed, mutilated, concealed, covered up, falsified and made false entries in records, documents and tangible objects with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, an investigation by the FBI and the United States Department of Justice of possible violations of U.S. antitrust law, in relation to and contemplation of such matter and case, and furthermore did order and command other employees of the Defendant to do so, in violation of 18 U.S.C. § 1519.

> After becoming aware of the FBI search of Defendant's co-conspirator's U.S. offices, Executive A informed certain of his subordinates employed at the U.S. subsidiary of Defendant about the FBI search, and instructed such subordinates, as well as other employees of Defendant, to locate, conceal and destroy documents

**REDACTED**

and electronic files that were likely to contain evidence of antitrust crimes in the United States and elsewhere.

Executive A concealed and destroyed documents and electronic files in his possession, custody and control in the Eastern District of Michigan that were likely to contain evidence of antitrust crimes in the United States and elsewhere. Certain of Executive A's subordinates and other employees of Defendant took acts in the Eastern District of Michigan and elsewhere to endeavor to conceal and destroy such documents and electronic files in the possession, custody and control of Defendant, and did conceal and destroy such documents and electronic files.

### Defendant Mitsubishi Electric Corporation Pleads Guilty to Price-Fixing

168.    On September 26, 2013, the DOJ announced that Defendant Mitsubishi Electric Corporation agreed to pay a $190 million criminal fine and plead guilty to a one-count Information charging it with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts sold to automobile manufacturers, including Ford Motor Company, General Motors LLC, Chrysler Group LLC, Fuji Heavy Industries Ltd., Nissan Motor Company, Ltd, Honda Motor Company, Ltd., and certain of their subsidiaries in the United States and elsewhere, from at least as early as January 2000 through at least February 2010, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  For purposes of Mitsubishi Electric Corporation's plea agreement, "automotive parts" are defined to include, among other pats, starter motors and alternators.

169.    According to the Information filed, Defendant Mitsubishi Electric Corporation and its co-conspirators carried out the automotive parts combination and conspiracy by, among other things, the following:

**REDACTED**

(a)      participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)      agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)      agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

(d)      agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)      submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)      selling certain automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)      accepting payment for certain automotive parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)      engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme;

**REDACTED**

      (i)     employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

## Defendant Robert Bosch GmbH Pleads Guilty to Price-Fixing Certain Automotive Parts

170.    On March 31, 2015, the DOJ announced that Defendant Robert Bosch GmbH agreed to pay a $57.8 million criminal fine and plead guilty to a one-count criminal Information charging it with participating in a conspiracy to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts sold to DaimlerChrysler AG, Ford Motor Company, General Motors Company, Andreas Stihl AG & Co. and others, and certain of their subsidiaries in the United States and elsewhere, from at least as early as January 2000 until at least July 2011 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  For purposes of Bosch's plea agreement, "automotive parts" are defined to include, among other pats, starter motors.

171.    According to the Information filed, Defendant Robert Bosch GmbH and its co-conspirators carried out the automotive parts conspiracy by:

      (a)     participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile and internal combustion engine manufacturers in the United States and elsewhere;

      (b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile and internal combustion engine manufacturers in the United States and elsewhere;

**REDACTED**

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts sold to automobile and internal combustion engine manufacturers in the United States and elsewhere;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile and internal combustion engine manufacturers in the United States and elsewhere;

(e)     submitting bids, price quotations, and price adjustments to automobile and internal combustion engine manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling certain automotive parts to automobile and internal combustion engine manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for certain automotive parts sold to automobile and internal combustion engine manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme.

**D.   Likely Existence of a Cooperating Defendant**

172.   The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses conduct to the Department of Justice.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the

REDACTED

DOJ's ACPERA program as an "amnesty applicant."  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

173.    In light of the guilty pleas in this case, in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

### E.  Additional Criminal Pleadings in the Automotive Parts Industry

174.    On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. had agreed to plead guilty and to pay a $200 million criminal fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of automotive wire harnesses and related products to automobile manufacturers.

175.    In the press release announcing the fine against Furukawa Electric Co. Ltd., Sharis A. Pozen, then the Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division, said that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers."  Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."  The press release also quoted FBI's Special Agent in Charge Andrew G. Arena, who said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," and that "[t]he FBI is committed to aggressively pursuing any company involved in antitrust crimes."

REDACTED

176.    On January 30, 2012, the DOJ announced that Yazaki Corporation had agreed to plead guilty and to pay a $470 million criminal fine and DENSO Corporation, as stated above, had agreed to plead guilty and to pay a $78 million criminal fine for their respective involvement in multiple price-fixing and bid-rigging conspiracies in the sale of automotive parts to automobile manufacturers in the United States.   According to the three-count criminal Information filed against Yazaki, it engaged in three separate conspiracies: (i) to rig bids for and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to certain automobile manufactures in the United States and elsewhere; (ii) to rig bids for and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to certain automobile manufactures in the United States and elsewhere; and (iii) to fix, stabilize, and maintain the prices of fuel senders sold to an automobile manufacture in the United States and elsewhere. According to the two-count felony charge against Defendant DENSO Corporation, it engaged in conspiracies to rig bids for, and to fix, stabilize, and maintain the prices of, ECUs and HCPs sold to an automobile manufacturer in the United States and elsewhere.

177.    In the press release announcing the fines against Yazaki Corporation, its executives, and Defendant DENSO Corporation, Ms. Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ."  In the same press release, Special Agent in Charge Andrew G. Arena said that "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"

178.    Ms. Pozen said there is no doubt consumers were hurt financially by the automotive wire harness price-fixing conspiracy.  She further stated:  "By rigging bids on wiring

REDACTED

harnesses . . . the three companies inflated what some of their auto manufacturer clients paid, and indirectly, what consumers paid for some cars."

179.    On April 3, 2012, the DOJ announced that G.S. Electech, Inc. had agreed to plead guilty and to pay a $2.75 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, speed sensor wire assemblies used on antilock brake systems sold to an automobile manufacturer in the United States and elsewhere.

180.    On April 23, 2012, the DOJ announced that Fujikura Ltd. had agreed to plead guilty and to pay a $20 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere.

181.    On June 6, 2012, the DOJ announced that Autoliv Inc. had agreed to plead guilty to a two-count criminal Information and to pay a $14.5 criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by (i) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts sold to a Japanese automobile manufacturer; and (ii) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts, airbags, and/or steering wheels sold to a Japanese automobile manufacturer.

182.    On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH had agreed to plead guilty and to pay a $5.1 million criminal fine for its involvement in a combination and conspiracy, through its employees, including high level employees of its wholly-owned subsidiaries, to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts,

**REDACTED**

airbags and steering wheels sold to two German automobile manufacturers in the United States and elsewhere.

183.    On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. had agreed to plead guilty and to pay a $1 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to an automobile manufacturer in in the United States and elsewhere.

184.    On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. agreed to plead guilty and to pay a $17.7 million criminal fine for its involvement in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs sold to Toyota Motor Corporation and Toyota Motor Engineering & Manufacturing North America, Inc. in the United States and elsewhere.  Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

185.    Deputy Assistant Attorney General Scott Hammond, recently stated that the automotive parts cartel is "the biggest [cartel] with respect to the impact on U.S. business and consumers."On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. had agreed to plead guilty and to pay a $19 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, ignition coils sold to automobile manufacturers in the United States and elsewhere.

186.    In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said "[t]hose who engage in price

**REDACTED**

fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

187.   On July 18, 2013, Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of various automotive parts including high intensity discharge (HID) ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.

188.   On September 26, 2013, six Japanese automotive suppliers, in addition to Defendants Hitachi Automotive Systems Ltd., Mitsuba Corporation, and Mitsubishi Electric Corporation, agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than 30 different products:

> (a)   Mitsubishi Heavy Industries Ltd. agreed to plead guilty and to pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of compressors and condensers sold to automobile manufacturers in the United States and elsewhere;

> (b)   T.RAD Co. Ltd. agreed to plead guilty and to pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of radiators and automatic transmission fluid warmers ("ATF warmers") sold to automobile manufacturers in the United States and elsewhere;

> (c)   Valeo Japan Co. Ltd. agreed to plead guilty and to pay a $13.6 million criminal fine for its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the pries of air conditioning systems sold to automobile manufacturers in the United States and elsewhere;

**REDACTED**

(d)    JTEKT Corporation agreed to plead guilty and to pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered steering assemblies sold to automobile manufacturers in the United States and elsewhere;

(e)    NSK Ltd. agreed to plead guilty and to pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings sold to an automobile manufacturer in the United States and elsewhere; and

(f)    Yamashita Rubber Co. Ltd. agreed to plead guilty and to pay a $11 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, raise and maintain the prices of automotive anti-vibration rubber products sold in the United States and elsewhere to automobile manufacturers.

189.    The diagram below, which was prepared by the DOJ, illustrates the September 26, 2013 guilty pleas and the corresponding automotive parts to which the various manufacturers have admitted price-fixing.

REDACTED



190.    On October 9, 2013, Takata Corporation announced that it had agreed to pay $71.3 million to settle antitrust charges brought by the United States federal prosecutors for its role in a conspiracy to price-fix seatbelts.

191.    On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. had agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate conspiracies to fix the prices of automotive components involving anti-vibration rubber and constant-velocity-joint boots installed in automobiles sold in the United States and elsewhere.

REDACTED

192.    On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. had agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a conspiracy to fix prices of automotive high-intensity discharge (HID) lamp ballasts installed in automobiles sold in the United States and elsewhere.

193.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co. Ltd. had agreed to plead guilty and to pay a $56.6 million criminal fine for its roles in separate price-fixing conspiracies involving automobile lighting fixtures and automotive high-intensity discharge (HID) lamp ballasts installed in cars sold in the United States and elsewhere.

194.    On February 3, 2014, the DOJ announced that Defendant Aisan Industry Co. Ltd. had agreed to plead guilty and to pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to an automobile manufacturer in the United States and elsewhere.

195.    On February 13, 2014, the DOJ announced that Bridgestone Corp. had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.

196.    On April 23, 2014, the DOJ announced that Showa Corp. agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in cars sold in the United States and elsewhere.

197.    On August 19, 2014, the DOJ announced that NGK Sparkplug Co. Ltd. agreed to plead guilty and to pay a $52.1 million criminal fine for its role in a conspiracy to fix prices and

REDACTED

rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors installed in cars sold to automobile manufacturers in the United States and elsewhere.

198.   On September 29, 2014, the DOJ announced that Toyoda Gosei Co. Ltd. agreed to plead guilty and to pay a $26 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold to Toyota in the United States and by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels sold to Subaru and Toyota in the United States and elsewhere.

199.   On October 31, 2014, the DOJ announced that Hitachi Metals Ltd. agreed to plead guilty and to pay a $1.25 million criminal fine for its role in a conspiracy to allocate the sales of, rig bids for, and fix, raise, and maintain the prices of automotive brake hose sold to Toyota in the United States and elsewhere.

200.   On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. agreed to plead guilty and to pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices installed in cars sold to automobile manufacturers in the United States and elsewhere.

201.   On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. agreed to plead guilty and to pay a criminal fine of $4 million for their roles in a conspiracy to rig bids of instrument panel clusters installed in vehicles manufactured and sold in the United States.

202.   On January 27, 2015, the DOJ announced that Sanden Corp. agreed to plead guilty and to pay a criminal fine of $3.2 million for its role in a conspiracy to allocate the sales

REDACTED

of, rig bids for, and fix, raise, and maintain the prices of compressors used in air conditioning systems sold to Nissan North America, Inc. in the United States and elsewhere.

203. On April 28, 2015, the DOJ announced that Yamada Manufacturing Co., Ltd. had agreed to plead guilty and to pay a $2.5 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of steering columns sold to certain subsidiaries of Honda Motor Co., Ltd., in the United States and elsewhere, from at least as early as the fall of 2007 and continuing until as late as September 2012, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

204. To date, thirty-five companies and fifty-five executives have been charged in the DOJ's ongoing investigation into price-fixing and bid-rigging in the automotive parts industry. Each of the thirty-five companies has either pleaded guilty or agreed to plead guilty and altogether, they have agreed to pay more than $2.5 billion in criminal fines.

205. "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI's Special Agent in Charge Andrew G. Arena. "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," Arena also said. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

F. **Illustrative Examples**

206. Illustrative examples of Defendants' conspiratorial conduct in the market for Alternators and Starters include, but are not limited to, the following:

**REDACTED**



**REDACTED**



**REDACTED**



**REDACTED**

**REDACTED**



**REDACTED**



**REDACTED**



**REDACTED**



**G.      Damage to Plaintiffs and Other Automobile Dealers Caused by Defendants'
Illegal Activities**

227.      Defendants' conspiracy resulted in Defendants charging inflated prices to firms
who directly purchased Alternators and Starters from them and in those purchasers raising their
prices to subsequent purchasers.

228.      Having paid higher prices for components of the cars they sold to Plaintiffs and
the Classes and the Alternators and Starters they sold to Plaintiffs and the Classes, firms who
sold such Alternators and Starters and vehicles passed Defendants' overcharges on to Plaintiffs
and the Classes.

REDACTED

229.   The impact of Defendants' conspiracy on Plaintiffs' businesses was substantial. Automobile dealers were substantially injured by higher prices paid for Alternators and Starters and vehicles.

230.   Because, among other reasons, of the imperfect nature of competition among automobile dealers and the differentiation among dealers by brand and by location, Plaintiffs and the Classes had to and did absorb, at the very least, a significant portion of the overcharges that they paid due to Defendants' illegal activities.

231.   Plaintiffs have standing and have suffered damage compensable by indirect purchaser laws and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy.

## CLASS ACTION ALLEGATIONS

232.   Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that during the Class Period, (a) indirectly purchased one or more Alternator(s) and or Starter(s) manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing one or more Alternator(s) and or Starter(s) manufactured by the Defendants or any current or former subsidiary, affiliate or co-conspirator thereof.

233.   Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the law of unjust enrichment and the antitrust, unfair competition, and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, as well as the unjust enrichment laws of Missouri, Massachusetts and Illinois. The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, and

REDACTED

Illinois, are collectively referred to as the "Indirect Purchaser States."  These claims are

brought by Plaintiffs on behalf of themselves and persons and entities in the Indirect Purchaser

States listed in the Second, Third, and Fourth Claims as follows (the "Damages Class"):

> All automobile dealers, in the Indirect Purchaser States, that, during the
> Class Period (a) indirectly purchased one or more Alternator(s) and or
> Starter(s) manufactured by one of the Defendants or any current or
> former subsidiary or affiliate thereof, or any co-conspirator or (b)
> purchased vehicles containing one or more Alternator(s) and or
> Starter(s) manufactured by one of the Defendants or any current or
> former subsidiary, affiliate or co-conspirator thereof.

234.    The Nationwide Class and the Damages Class are referred to herein as the

"Classes."  Excluded from the Classes are the Defendants, their parent companies, subsidiaries

and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the

federal government, states and their subdivisions, agencies and instrumentalities, and persons

who purchased Alternators or Starters directly or for resale.

235.    While Plaintiffs do not know the exact number of the members of the Classes,

Plaintiffs believe there are (at least) thousands of members in each Class.

236.    Common questions of law and fact exist as to all members of the Classes.  This is

particularly true given the nature of the Defendants' conspiracy, which was generally applicable

to all the members of both Classes, thereby making appropriate relief with respect to the Classes

as a whole.  Such questions of law and fact common to the Classes include, but are not limited

to:

> (a)    Whether the Defendants and their co-conspirators engaged in a combination
>
> and conspiracy among themselves to fix, raise, maintain or stabilize the prices of
>
> Alternators and Starters sold in the United States;
>
> (b)    The identity of the participants of the alleged conspiracy;

**REDACTED**

(c)      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)      Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)      Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws, as alleged in the Second and Third Claims for Relief;

(f)      Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)      Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)      The effect of the alleged conspiracy on the prices of Alternators and Starters sold in the United States during the Class Period;

(i)      Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

(j)      The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)      The appropriate class-wide measure of damages for the Damages Class.

237.   Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.   Plaintiffs and all

**REDACTED**

members of the Classes are similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for Alternators and Starters purchased indirectly from the Defendants and/or their co-conspirators.

238.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

239.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

240.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

241.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

**<u>PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY</u>**

242.    The Defendants' price-fixing conspiracy had the following effects, among others:

**REDACTED**

(a)      Price competition has been restrained or eliminated with respect to Alternators and Starters;

(b)      The prices of Alternators and Starters have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)      Defendants charged purchasers of their Alternators or Starters inflated, fixed and stabilized prices for such Alternators or Starters;

(d)      Having paid higher prices for components of the cars they sold to Plaintiffs and the Classes and the Alternators or Starters they sold to Plaintiffs and the Classes, firms who sold Defendants' Alternators or Starters and vehicles to Plaintiffs and the Classes passed Defendants' overcharges  on to them;

(e)      Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Classes; and

(f)      Automobile dealers purchasing Alternators or Starters and vehicles containing Alternators or Starters have been deprived of free and open competition.

(g)      Indirect purchasers of Alternators and Starters have been deprived of free and open competition; and,Indirect purchasers of Alternators and Starters paid artificially inflated prices.

243.    During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Alternators and Starters, as a result of Defendants' conspiracy.

244.    An increase in the prices of Alternators or Starters caused an increase in the price of vehicles during the Class Period.

245.    Plaintiffs and the Classes are entitled to the overcharges they paid for Alternators or Starters.

81

**REDACTED**

246.    The markets for Alternators and Starters and the market for vehicles are inextricably linked and intertwined because the market for Alternators and Starters exists to serve the vehicle market.  Without the vehicles, the Alternators and Starters have little to no value because they have no independent utility and must be inserted into vehicles to serve any function.  Indeed, the demand for vehicles creates the demand for Alternators and Starters.

247.    Alternators and Starters are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Alternators and Starters follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and costs attributable to Alternators and Starters can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

248.    Just as Alternators and Starters can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Alternators and Starters affect prices paid by indirect purchasers of new motor vehicles containing Alternators and Starters.

249.    Alternators or Starters have their own part numbers, which permit them to be tracked.

250.    Alternators or Starters are pieces of sophisticated electrical equipment that are necessary to operate a vehicle.

251.    Alternators or Starters are found in every vehicle and can be removed from a finished vehicle and replaced.

252.    The Alternators or Starters subject to Defendants' conspiracy and at issue in this lawsuit only have one use: to be inserted into vehicles.  Whether Alternators or Starters are sold by themselves or in vehicles, their purpose is to be inserted into vehicles.

REDACTED

253.     Alternators or Starters comprise a not insignificant portion of the cost of a vehicle.

254.     The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of Alternators and Starters and, as a direct and foreseeable result, the price of new motor vehicles containing Alternators and Starters. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Alternators and Starters on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Alternators and Starters affects changes in the price of new motor vehicles. In such models, the price of Alternators and Starters would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Alternators and Starters impact the price of new motor vehicles containing Alternators and Starters while controlling for the impact of other price-determining factors.

255.     The precise amount of the overcharge impacting the prices of new motor vehicles containing Alternators and Starters can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-

REDACTED

competitive charge passed through the chain of distribution.   Thus, the economic harm to Plaintiffs and class members can be quantified.

256.     By reason of the violations of the antitrust law alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Alternators and Starters than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent and Plaintiffs' and Class members' damages are measurable.

### PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

#### A.  The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims

257.     Plaintiffs repeat and re-allege the allegations set forth above.

258.     Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) the public announcements of the government investigations in to Alternators and Starters price-fixing began in July 2011. [2]

---

[2] Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest), September 26, 2013 for Mitsuba, the date that the DOJ publicly announced it agreed to plead guilty, ███████████████████████████████████████ ███████████████████████   No information in the public domain was available to the Plaintiffs and the members of the Classes prior to these dates that revealed sufficient information to suggest that Defendants Mitsuba and Bosch were involved in the combination or conspiracy alleged herein. Therefore, the statute of limitations did not begin to run because Plaintiffs and members of the Classes did not and could not discover their claims, or in the alternative, because fraudulent concealment tolled the statute of limitations, until these dates for the respective defendants.

**REDACTED**

259.    Plaintiffs and the members of the Classes are automobile dealers who had no direct contact or interaction with any of the Defendants in this case and had no means by which they could have discovered the combination and conspiracy described in this Complaint  before the public announcements of the government investigations began in July 2011.

260.    No information in the public domain was available to Plaintiffs and members of the Classes prior to the public announcements of the government investigations beginning in July 2011 that revealed sufficient information to suggest that the Defendants were involved in a criminal conspiracy to price-fix and rig bids for Alternators and Starters.  Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of the Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

261.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and members of the Classes have alleged in this Complaint.

### H.  Fraudulent Concealment Tolled the Statute of Limitations

262.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the public announcement of the government investigations into Alternators and Starters price-fixing.[3]

---

[3] *See* footnote two.

REDACTED

263.    Before that time, Plaintiffs and the members of the Classes were unaware of the Defendants' unlawful conduct, and did not know before then that they were paying supra-competitive prices for Alternators and Starters throughout the United States during the Class Period.   No information, actual or constructive, was ever made available to Plaintiffs and members of the Classes that even hinted to Plaintiffs that they were being injured by the Defendants' unlawful conduct.

264.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

265.    Specifically, as Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the Automotive parts industry, "[i]n order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

266.    As stated in the Information filed against Defendant Hitachi Automotive Systems, Ltd., the Defendants and their co-conspirators employed "measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations."

267.    A former executive of Defendant DENSO, Kazuaki Fujitani, pleaded guilty to a charge of obstruction of justice in which he  admitted that he "corruptly destroyed and concealed a record and document, that is, by deleting numerous emails and electronic files" for a related automotive part.

268.    In addition, two employees of Hitachi, Minoru Kurisaki and Hideyuki Saito were charged by the DOJ with knowingly conspiring to obstruct justice by destroying documents and corruptly persuading, and attempting to persuade others, to destroy documents related to an official proceeding, grand jury investigation, and U.S. agency investigation.   The DOJ also

**REDACTED**

charged Hideyuki Saito with obstruction of justice by knowingly and corruptly persuading or attempting to persuade other employees of Mitsubishi Electric Corporation to destroy or conceal paper documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere with the intent to impair the objects' availability and integrity for use in official proceedings.

269.    Defendant Mitsuba Corporation also pleaded guilty to a charge of obstruction of justice in which it explicitly admitted to "altering, destroying, mutilating, concealing, covering up, falsifying and making false entries in documents and tangible objects with the intent to impede, obstruction, and influence" the DOJ's investigation into the price-fixing of several automotive parts, including Alternators and Starters.  According to Mitsuba Corporation's plea agreement, in February 2010, three of Mitsuba's senior executives learned that the offices of a co-conspirator had been searched by law enforcement authorities in connection with an investigation of possible antitrust violations, and they directed their subordinates and other employees to "conceal and destroy documents and electronic files" in both the United States and Japan. Mitsuba Corporation's plea agreement confirmed that such evidence was concealed and destroyed.

270.    By its very nature, the Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing.  Alternators and Starters are not exempt from antitrust regulation and, thus, before July 2011, Plaintiffs reasonably considered the Alternators and Starters industry to be a competitive industry.  Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.

**REDACTED**

Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the Defendants' Alternator and Starter prices before July 2011.

271.   Plaintiffs and the members of the Classes did not discover, and could not have discovered the alleged contact, combination, or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

272.   Throughout the course of the conspiracy, the Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof.  Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations.  The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs.  The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty to criminal violations of the Sherman Act.

273.   Because Defendants' agreements, understandings, and conspiracies were kept secret until March 2012, Plaintiffs and members of the Classes before that time were unaware of Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices for Alternators or Starters throughout the United States during the Class Period. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

**REDACTED**

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

277.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

278.   The Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

279.   The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

280.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Alternators or Starters, thereby creating anticompetitive effects.

281.   The anticompetitive acts were intentionally directed at the United States market for Alternators or Starters and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Alternators or Starters throughout the United States.

282.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for Alternators or Starters.

283.   As a result of the Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Alternators or Starters have been harmed by being forced to pay inflated, supra-competitive prices for Alternators or Starters.

284.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and

**REDACTED**

conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

285.   Defendants and their co-conspirators' conspiracy had the following effects, among others:

      a.   Price competition in the market for Alternators or Starters has been restrained, suppressed, and/or eliminated in the United States;

      b.   Prices for Alternators or Starters sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

      c.   Plaintiffs and members of the Nationwide Class who purchased Alternators or Starters indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

286.   Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Alternators or Starters and vehicles containing Alternators or Starters than they would have paid and will pay in the absence of the conspiracy.

287.   Plaintiffs and members of the Nationwide Class will continue to be subject to the Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Alternators or Starters and vehicles containing Alternators or Starters.

288.   Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Alternators or Starters and vehicles containing Alternators or Starters because

**REDACTED**

they are required to purchase vehicles and Alternators or Starters to continue to operate their businesses.

289.    Plaintiffs and members of the Nationwide Class continue to purchase vehicles and Alternators or Starters on a regular basis.

290.    Vehicles and Alternators or Starters continue to be sold at inflated and supra-competitive prices.

291.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

292.    Plaintiffs and members of the Nationwide Class will be at the mercy of the Defendants' unlawful conduct until the Court orders an injunction.

293.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against the Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF

**Violation of State Antitrust Statutes
(on behalf of Plaintiffs and the Damages Class)**

294.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

295.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Alternators or Starters in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

296.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially

**REDACTED**

supra-competitive prices for Alternators or Starters and to allocate customers for Alternators or Starters in the United States.

297.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

a.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Alternators or Starters at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Alternators or Starters sold in the United States;

b.    allocating customers and markets for Alternators or Starters in the United States in furtherance of their agreements; and

c.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

298.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to Alternators or Starters.

299.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

300.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

a.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators and Starters price competition was restrained,

**REDACTED**

suppressed, and eliminated throughout Arizona; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

b.      During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

301.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

a.      During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code.  Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Alternators or Starters at supra-competitive levels.

**REDACTED**

b.     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Alternators or Starters.

c.     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Alternators or Starters; and (2) Allocating among themselves the production of Alternators or Starters.

d.     The combination and conspiracy alleged herein has had, inter alia, the following effects:  (1) Price competition in the sale of Alternators or Starters has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Alternators or Starters sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Alternators or Starters directly or indirectly from the Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

e.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Alternators or Starters than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants'

**REDACTED**

violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

302.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

a.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:   (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Alternators and Starters prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Alternators or Starters or vehicles in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Alternators or Starters or vehicles in the District of Columbia, paid supra-competitive, artificially inflated prices for Alternators or Starters, including in the District of Columbia.

b.    During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

95

**REDACTED**

      d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

303.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, et seq.

      (a)    Defendants' unlawful conduct had the following effects: (1) Alternators or Starters' price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Alternators or Starters' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

      (b)    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

      (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

REDACTED

304.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*.

a.   The Defendants' combinations or conspiracies had the following effects: (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

b.   During the Class Period, the Defendants' illegal conduct substantially affected Illinois commerce.

c.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*.[4]

305.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq*.

---

[4] Dealership Plaintiffs recognize that their claims under the Illinois Antitrust Act were dismissed in the *Wire Harness* action.  Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal

**REDACTED**

a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Alternators or Starters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

b.      During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

306.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3)

**REDACTED**

Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

b. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

307. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

a. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Maine; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

**REDACTED**

b.      During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

308.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

a.      Defendants' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters.

b.      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

309.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

a.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:   (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

b.     During the Class Period, the Defendants' illegal conduct substantially affected Minnesota commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.   Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

**REDACTED**

310.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Alternators or Starters or vehicles in Mississippi, were deprived of free and open competition, including in Mississippi; and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Alternators or Starters or vehicles in Mississippi, paid supra-competitive, artificially inflated prices for Alternators or Starters, including in Mississippi.

b.      During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq*.

311.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq*.

**REDACTED**

a.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:   (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Alternators or Starters prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

b.     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

312.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

a.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:   (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3)

**REDACTED**

Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Alternators or Starters or vehicles in Nevada,  were deprived of free and open competition, including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Alternators or Starters or vehicles in Nevada,  paid supra-competitive, artificially inflated prices for Alternators or Starters, including in Nevada.

      b.      During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

313.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

      a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-

**REDACTED**

competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

      b.     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

      c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

314.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

      a.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

      b.     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

**REDACTED**

        c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

315.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

        a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout New York; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Alternators or Starters or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Alternators or Starters or vehicles in New York, paid supra-competitive, artificially inflated prices for Alternators or Starters when they purchased, including in New York.

        b.      During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

**REDACTED**

     c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

     d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

316.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

     a.     Defendants' combinations or conspiracies had the following effects: (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Alternators or Starters or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Alternators or Starters or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for Alternators or Starters, including in North Carolina.

     b.     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

**REDACTED**

c.      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

317.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

   d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

318.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

   a.  Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

   b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

   c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

   d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

109

**REDACTED**

319.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

a.   Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Alternators or Starters or vehicles in South Dakota, were deprived of free and open competition, including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Alternators or Starters or vehicles in South Dakota, paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters, including in South Dakota.

b.   During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

REDACTED

320.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

a.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Alternators or Starters or vehicles in Tennessee, were deprived of free and open competition, including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Alternators or Starters or vehicles in Tennessee, paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters, including in Tennessee.

b.    During the Class Period, the Defendants' illegal conduct had a substantial effect on Tennessee commerce.

c.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

REDACTED

321.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq*.

a.   Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Utah; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

322.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2451, *et seq*.

a.   Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained,

**REDACTED**

suppressed, and eliminated throughout Vermont; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2451, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2451, *et seq*.

323.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Alternators or Starters prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Alternators or Starters or vehicles in West Virginia,

**REDACTED**

were deprived of free and open competition, including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Alternators or Starters or vehicles in West Virginia, paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters, including in West Virginia.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

324.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq*.

a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-

**REDACTED**

competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

325.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Plaintiffs and members of the Damages Class have paid more for Alternators or Starters than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

326.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

327.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled

**REDACTED**

or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF

### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiffs and the Damages Class)

328.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

329.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

330.     Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*.

      a.    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Alternators or Starters were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

      b.    The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

      c.    Defendants' unlawful conduct had the following effects:  (1) Alternators and Starters price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Alternators and Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members

116

**REDACTED**

of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

      d.    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

      e.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

      f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

331.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

      a.    During the Class Period, Defendants marketed, sold, or distributed Alternators and Starters(s) in California and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.\

      b.    During the Class Period, the Defendants' illegal conduct substantially affected California commerce and consumers.

      c.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants

**REDACTED**

for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

d.      Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

e.      Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent;

f.      Defendants' acts or practices are unfair to consumers of Alternators or Starters  (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

g.      Defendants' unlawful conduct had the following effects: (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout California; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/ or purchased Alternators or Starters or vehicles in California, were deprived of free and open

**REDACTED**

competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Alternators or Starters or vehicles in California, paid supracompetitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters, including in California.

h.      Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

i.      Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

j.      The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

k.      As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

332.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

**REDACTED**

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Alternators or Starters were sold, distributed, or obtained in the District of Columbia.

b.      The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

c.      During the Class Period, the Defendants' illegal conduct substantially affected District of Columbia commerce and consumers.

d.      Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Alternators or Starters.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

e.      Moreover, Plaintiffs lacked any meaningful choice in purchasing Alternators or Starters because they were unaware of the unlawful overcharge and because they had to purchase Alternators or Starters  as a necessary part of the vehicles they purchased.

f.      Defendants' conduct with regard to sales of Alternators or Starters, including their illegal conspiracy to secretly fix the price of Alternators or Starters at supra-competitive levels and overcharge purchasers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.

**REDACTED**

        g.      Defendants' unlawful conduct had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and the Damages Class, including those who resided in the District of Columbia were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and the Damages Class, including those who resided in the District of Columbia and/or purchased Alternators or Starters in the District of Columbia paid supra-competitive, artificially inflated prices for Alternators or Starters, including in the District of Columbia.

        h.      The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Alternators or Starters, due to the inflated prices paid by Plaintiffs and Class members for vehicles and Alternators or Starters.

        i.      As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

    333.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

REDACTED

        a.     Defendants' unlawful conduct had the following effects: (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Florida; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters.

        b.     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

        c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

        d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

334.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

        a.     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Alternators or Starters were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

REDACTED

       b.    Plaintiffs were not aware of the Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by the Defendants for Alternators or Starters.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Alternators or Starters because they were unaware of the unlawful overcharge and because they had to purchase Alternators or Starters in order to be able to operate their vehicles.  The Defendants' conduct with regard to sales of Alternators or Starters, including their illegal conspiracy to secretly fix the price of Alternators or Starters at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited the Defendants at the expense of Plaintiffs and the public.  The Defendants took grossly unfair advantage of Plaintiffs.

       c.    The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Alternators or Starters as set forth in N.M.S.A., § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for vehicles and Alternators or Starters.

       d.    Defendants' unlawful conduct had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the

**REDACTED**

Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters.

      e.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

      f.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

      g.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

335.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

      a.    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Alternators or Starters were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

      b.    Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Alternators or Starters they had purchased inside vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

**REDACTED**

   c.  The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

   d.  Because of the Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Alternators or Starters were misled to believe that they were paying a fair price for Alternators or Starters or the price increases for Alternators or Starters were for valid business reasons.

   e.  Defendants' unlawful conduct had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout New York; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of vehicles or Alternators or Starters  in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York, including in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of vehicles or Alternators or Starters  in New York, paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters, including in New York.

   f.  Defendants knew that their unlawful trade practices with respect to pricing Alternators or Starters would have an impact on all purchasers in New York and not just the Defendants' direct customers.

**REDACTED**

> g.     Defendants knew that their unlawful trade practices with respect to pricing Alternators or Starters would have a broad impact, causing consumer class members who indirectly purchased Alternators or Starters to be injured by paying more for Alternators or Starters than they would have paid in the absence of Defendants' unlawful trade acts and practices.

> h.     During the Class Period, Defendants' marketed, sold, or distributed Alternators or Starters in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

> i.     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Alternators or Starters in New York.

> j.     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

336.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

> a.     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Alternators or Starters were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

> b.     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed

**REDACTED**

the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

c. Defendants' unlawful conduct had the following effects: (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Alternators or Starters or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Alternators or Starters or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for Alternators or Starters and vehicles containing Alternators or Starters, including in North Carolina.

d. During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of Alternators or Starters and vehicles. The Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by the Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of the Defendants' price-fixing conspiracy. The Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Moreover, the Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

REDACTED

      e.     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Alternators or Starters in North Carolina.

      f.     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

337.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*[5]

      a.     Defendants' combinations or conspiracies had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters.

---

[5] Dealership Plaintiffs recognize that their claims under the South Carolina Unfair Trade Practices Act were dismissed in previous actions.  Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal.

**REDACTED**

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

338.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

a.      Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Alternators or Starters were sold, distributed, or obtained in Vermont.

b.      Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Alternators or Starters.  Defendants owed a duty to disclose such facts.  Defendants misrepresented to all purchasers during the Class Period that their Alternators and Starters prices were competitive and fair.

c.      Defendants' unlawful conduct had the following effects:  (1) Alternators or Starters price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Alternators or Starters prices were raised, fixed, maintained, and stabilized

**REDACTED**

at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Alternators or Starters.

d.      As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.   That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

e.      Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Alternators or Starters, likely misled purchasers acting reasonably under the circumstances to believe that they were purchasing Alternators or Starters at prices set by a free and fair market.   Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

<u>FOURTH CLAIM FOR RELIEF</u>
**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Class)**

339.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

340.   Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra.*, except California. Plaintiffs also bring this claim under the laws of Missouri, Massachusetts, South Carolina and Illinois on behalf of the Plaintiffs who have their primary places of business in those three states and the class members in those states.

130

**REDACTED**

341.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Alternators or Starters.

342.    Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Alternators or Starters.

343.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

344.    Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased Alternators or Starters and vehicles containing Alternators or Starters subject to the Defendants' conspiracy would have been futile, given that those firms did not take part in the Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

**REDACTED**

B.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

a.     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

b.     A *per se* violation of Section 1 of the Sherman Act;

c.     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

d.     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

**REDACTED**

F.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  September 25, 2015                    Respectfully submitted,


                                              /s/  *Gerard V. Mantese*
                                              Gerard V. Mantese
                                              (Michigan Bar No. P34424)
                                              Alex Blum (Michigan Bar No. P74070)
                                              Mantese Honigman P.C.
                                              1361 E. Big Beaver Road
                                              Troy, Michigan 48083
                                              Telephone: (248) 457-9200
                                              gmantese@manteselaw.com
                                              ablum@manteselaw.com

REDACTED

Don Barrett
Brian Herrington
David McMullan
Barrett Law Group, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com

Shawn M. Raiter
Larson • King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
sraiter@larsonking.com

Michael J. Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker
Suite 801
St. Louis, MO  63101
Telephone:  (314) 226-1015
mflannery@cuneolaw.com

Phillip Duncan
Richard Quintus
Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
phillip@duncanfirm.com
richard@duncanfirm.com

Thomas P. Thrash
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net

Dewitt Lovelace
Valerie Nettles
Lovelace & Associates, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
charles@cfbfirm.com

Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124

**REDACTED**

Telephone: (952) 930-2485
greg@gjohnsonlegal.com

*Attorneys for Dealership Plaintiffs*